UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRANKLIN THOMAS LAPLANTE, )<br>)<br>　　Plaintiff, )<br>)<br>　　　　v. )<br>)<br>CAROLYN W. COLVIN, )<br>Acting Commissioner of Social )<br>Security Administration, )<br>)<br>　　Defendant. ) | Case No. 3:14-cv-30126-KAR |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 15 & 19)
August 10, 2015

ROBERTSON, U.S.M.J.

I.　　Introduction

This action seeks review of a final decision of the Acting Commissioner of Social Security ("Commissioner") denying the application of plaintiff Franklin Thomas Laplante ("Plaintiff") for Supplemental Security Income ("SSI"). Plaintiff applied for SSI on November 9, 2010, alleging an October 1, 2007 onset of disability, due to problems stemming from bipolar disorder and a nervous condition (A.R. at 69-70).[1] The application was denied initially and on reconsideration (*id*. at 80, 92). A hearing was held on October 18, 2012, at which Plaintiff alleged disability due to bipolar disorder and a nervous condition. The Administrative Law Judge ("ALJ") found that Plaintiff was not disabled and denied Plaintiff's claim (*id*. at 21-29). The Appeals Council denied review (*id*. at 5-8), and, thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

---
[1] A copy of the Administrative Record (referred to herein as "A.R.") has been provided to the court under seal (Dkt. No. 14).

Plaintiff moves for summary judgment against the Commissioner pursuant to Fed. R. Civ. P. 56 on the grounds that the ALJ's determination is not supported by "substantial evidence" under 42 U.S.C. § 1383(c)(3). Pending before this court are Plaintiff's motion for summary judgment requesting that the Commissioner's decision be vacated or remanded for further proceedings (Dkt. No. 15) and the Commissioner's motion for an order affirming the decision (Dkt. No. 19). The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following reasons, the court will allow the Commissioner's motion to affirm and deny Plaintiff's motion for summary judgment.

II.     Facts

Plaintiff was fifty-four (54) at the time of the hearing (A.R. at 49). He attended high school through the eleventh grade, but did not earn a high school diploma (*id.* at 48-49). His last previous employment was as a welder (*id.* at 51, 65).

Plaintiff saw Dr. Lawrence Bernstein at Chicopee Medical Center in October of 2008 (*id.* at 376). At that visit, the doctor appears to have noted he was bipolar, but indicated that he was psychologically within normal limits (*id.* at 376). Plaintiff began seeing Dr. Stanley Glasser in October of 2009 after leaving Dr. Bernstein because of a "difference in opinion" (*id.* at 267). He was treated for high cholesterol by Dr. Glasser who noted that Plaintiff "needs to have a psych eval" (*id.* 227). Dr. Glasser referred Plaintiff to psychopharmacologist Geraldine A. Kasulinous, APRN, PC, FNP-C for treatment (*id.* at 202).

The most significant notes of treatment in the Administrative Record were prepared by Ms. Kasulinous, with whom Plaintiff began treatment on November 20, 2009 (*id.* at 202). She saw him regularly over the span of almost three years for the purpose of prescribing medication (*id.* at 232-249, 280-291, and 336-341). During Plaintiff's initial evaluation, Ms. Kasulinous

diagnosed him with bipolar disorder, major depressive disorder ("MDD"), general anxiety disorder ("GAD"), and a history of alcohol abuse (*id.* at 203). Ms. Kasulinous prepared a standard treatment note at each appointment. These notes provide a general picture of psychological stability.[2] In December of 2010, Ms. Kasulinous completed a "Mental Capacity Exam" in which Plaintiff was generally noted to have marked and extreme limitations (*id.* at 205-207). In February of 2012, Ms. Kasulinous completed an identical form and Plaintiff's impairments improved to moderate and marked (*id.* at 276-278).[3] On August 31, 2011, Ms. Kasulinous prepared a "Psychiatric Disorder" form, assigning Plaintiff a GAF of 75-80, which indicates "no more than slight impairment in social, occupational or social functioning" (*id.* at 271-273). [4]

---

[2]With regards to mood/affect Plaintiff was found to be within normal limits for 25 of the 36 visits, being depressed or slightly depressed on 7 visits (*id*. at 235, 244, 238, 237, 283, 288, 289), anxious on 4 visits (*id.* at 234, 288, 285, 283), angry on 2 (*id.* at 232, 285), irritable on 6 (*id.* at 234, 232, 289, 288, 285, 283), and labile once (*id.* at 288). Plaintiff was within normal limits on the cognition assessment at every visit with the exception of August 15, 2011, when he reportedly was grandiose (*id.* at 288). Other than on two occasions, his behavior was within normal limits. On February 17, 2011, he was slightly hostile and August 15, 2011 he was reportedly guarded (*id.* at 232 and 288). His sleep and appetite were consistently reported as fair, fair to good, or good for each visit (*id*. at 232 – 249, 280-291, 336-341).

[3]The record indicates that Ms. Kasulinous completed a third "Mental Evaluation Exam" on June 26, 2012, but parts of this form are missing from the record (*id.* at 320-321). From what is available in the record, it appears that the results of the June 2012 examination largely mirror the results of the February 2012 examination.

[4] A GAF score between 71 and 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentration after family argument); no more than slight impairment in social, occupational or social functioning (e.g., temporarily falling behind in school)." Diagnostic and Statistical Manual of Mental Disorders 34 (American Psych. Assoc., 4th ed., 2000) ("DSM-IV").

On June 14, 2011, Plaintiff was examined by Dr. Robert Sampson, M.D. who was authorized or contracted by the Massachusetts Disability Determination Services to examine Plaintiff (*id.* at 250-256). This was the only occasion on which Dr. Sampson saw Plaintiff. He based his evaluation on his interview with Plaintiff and progress notes from Ms. Kasulinous (*id.* at 250). The interview was "solely for Social Security evaluation" and no therapy was offered or recommended (*id.* at 250). Dr. Sampson opined that Plaintiff appeared to be able to understand, follow, and remember simple instructions (*id.*). He stated that Plaintiff likely would have moderate to severe impairments in his interaction with supervisors and co-workers and moderate to severe impairments in his response to routine work pressures in a competitive work environment (*id.*). Dr. Sampson assessed a GAF score of 50-55 (*id.* at 255).[5]

### III.   Hearing Testimony

Plaintiff testified to his educational background, employment history, and living situation (*id.* at 48, 50-51). He said he did not go anywhere besides the doctor's office (*id.* at 55). He claimed to be uncomfortable in crowds and said his "good days" were days he stayed away from people (*id.* at 62, 64). In terms of daily activities, Plaintiff testified that he cooked and did his own laundry unless his mother did so, and bathed, groomed, and dressed himself (*id.* at 56). He walked to the variety store to purchase cigarettes (*id.* at 60).

When asked why he did not work, Plaintiff stated that nobody wanted to hire him and he did not like people (*id.* at 59-60). He also testified that he had been fired from jobs in the past for drinking on the job and conflicts he had with bosses (*id.* at 60). Plaintiff stated that he was

---

[5] A GAF score between 41 and 50 reflects "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." A GAF score between 51 and 60 reflects "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." DSM-IV at 34.

distracted on the job, made mistakes, and was more distractible when on his medications (*id.* at 61).

An impartial vocational expert ("VE") also testified at the hearing. The ALJ posed a hypothetical question to the VE asking her to identify jobs that would be available for an individual with the residual functional capacity of no exertional limitations, except the position should require no more than frequent grasping, pinching, or twisting within a dominant left-handed arm (*id.* at 66). Work should be limited to simple and unskilled tasks, entail no more than incidental public contact, and no more than occasional co-worker contact (*id.*). The VE identified three jobs for such an individual; namely a cleaner, a warehouse worker, and a laundry worker (*id.* at 66-67).

    IV.    Discussion

        A.  Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. 42 U.S.C. § 1383(c)(3). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir.1999) (per curiam)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)). In applying the substantial evidence standard, the court must be mindful that it is the

province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *Id*. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id*. at 770. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

B. <u>Standard for Entitlement to Supplemental Social Security Income</u>

In order to qualify for SSI, a claimant must demonstrate that he or she is disabled within the meaning of the Social Security Act. A claimant is disabled for purposes of SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A). A claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute. *See* 20 C.F.R. § 416.920. The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5)

whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See* 20 C.F.R. § 416.920(a)(4). *See also Goodermote v. Sec'y of Health & Human Servs,* 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. *See* 20 C.F.R. § 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See* 20 C.F.R. § 416.920(e). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996). "Work-related mental activities generally … include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id*. at *6.

The claimant has the burden of proof through step four of the analysis. At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform. *Goodermote,* 690 F.2d at 7.

    C. <u>The ALJ's Decision</u>

To determine whether Plaintiff was disabled, the ALJ conducted the five-step analysis required by regulations. At the first step, the ALJ found that Plaintiff had not been engaged in

substantial gainful activity since November 9, 2010, the application date (A.R. at 23).  At the second step, the ALJ found that Plaintiff had a severe impairment, bipolar disorder, and certain non-severe impairments, those being alcohol and substance abuse (*id.*).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in Appendix 1 (*id.* at 24).  The ALJ found that Plaintiff did not meet the criteria because Plaintiff had only mild restrictions of daily living, moderate difficulties in social interactions, moderate difficulties with regards to concentration, persistence, or pace, and had no periods of decompensation which lasted for an extended duration (*id.* at 24).  *See* 10 C.F.R. § Pt. 404, Subpt. P, App. 1.

Before proceeding to step 4, the ALJ found that Plaintiff had the RFC to perform simple and unskilled tasks that required no more than frequent grasping, pinching or twisting with his dominant left hand, with no more than incidental public contact, and no more than occasional co-worker contact (A.R. at 25).  At step four, the ALJ found that the claimant was unable to perform any past relevant work (*id.*at 27).  Finally, at step five, relying on the testimony of the VE, the ALJ determined that Plaintiff could perform jobs found in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled (*id.* at 27-28).

      D.  <u>Analysis</u>

Plaintiff advances three arguments challenging the ALJ's decision.  First, Plaintiff argues that the RFC determination is not supported by substantial evidence.  Second, Plaintiff claims the ALJ erred when he failed to properly analyze Plaintiff's credibility.  Third, Plaintiff claims that, as a result of these failures, the ALJ's step five finding is not supported by substantial evidence.

        i.  <u>The ALJ's RFC is Supported by Substantial Evidence</u>

In arguing that the RFC determination was not supported by substantial evidence, Plaintiff faults the ALJ for failing to assign any weight to Dr. Robert Sampson's "Consultative Examination Report" and failing to explain why this assessment was not reflected in the RFC.[6]

First, because Dr. Sampson was not a treating source, his opinion was not entitled to controlling weight.[7] He saw Plaintiff on one occasion for purposes of an evaluation at the request of the Massachusetts Disability Determination Services (*id.* at 250). Second, Plaintiff substantially overstates the extent of the limitations as to which Dr. Sampson offered an opinion based on this single encounter. Dr. Sampson opined that Plaintiff would have *moderate* to severe limitations in his interactions with supervisors and coworkers as well as *moderate* to severe impairments in his response to routine work pressures in a competitive work environment (*id.* at 254). There is a notable difference between "moderate to severe" and "severe." That Dr. Sampson did not conclude that Plaintiff fell on the severe end of the scale is confirmed by his assignment of a GAF of 50-55 (*id.* at 255).

The ALJ also was entitled to consider that, to the extent Dr. Sampson's evaluation supported "severe" restrictions on Plaintiff's part, that evaluation was inconsistent with Dr. Sampson's record indicating that Plaintiff carried on a relationship with a significant other, enjoyed siting on the porch, did yardwork, and was able to do his own laundry (*id.* a 252-253), and with the notes of Ms. Kasulinous, who treated plaintiff over an extended period of time, and

---

[6] Plaintiff relies, in part, on 20 C.F.R. § 416.927(e)(2)(ii), which states that unless a treating source's opinion is given controlling weight, the ALJ must explain in his decision what weight he gives to medical opinions from State agency consultants and program physicians, as well as the opinions of all treating, examining, or non-examining sources.

[7] An acceptable medical source who evaluates a patient on one occasion fails to qualify as a "treating source." *Mims v. Colvin*, No. 14–30078–MGM, 2015 WL 3874890 at *3 (D. Mass. June 23, 2015); *see* 20 C.F.R. § 416.902 (defining "treating source"); *see also* 20 C.F.R. § 416.913 (defining "acceptable medical sources").

whose records do not support a finding of severe restrictions or an inability to work (A.R. at 27).[8] The ALJ's opinion explicitly resolved the conflict between Dr. Sampson's opinion and other portions of the record against Dr. Sampson (*id.* at 27). On Plaintiff's first visit to Ms. Kasulinous, he reported that he "[did] odd jobs" (*id.* at 203), and he generally presented as psychologically within normal limits. *See supra* note 2. It was up to the ALJ to resolve such conflicts in the evidence. *See Irlanda Ortiz,* 955 F.2d at 769.

The ALJ's question to the VE provided that Plaintiff would be limited to no more than occasional contact with co-workers. The ALJ was not required to include in his hypothetical question to the V.E. Dr. Sampson's view that Plaintiff would be restricted to some degree in interacting with supervisors. "Plaintiff's limitations pertain to [his] ability to interact socially and control [his] anger, so the distinctions between supervisors and the public and coworkers is minor." *Brown v. Colvin*, No. 13-cv-370-bbc, 2014 WL 2050269, at *1 (W.D. Wis. May 16, 2014). The ALJ also could consider that both state agency psychologists noted in their assessments that Plaintiff was only "moderately limited" in his "ability to accept instruction and respond appropriately to criticism from supervisors" (*id.* at 77, 90). In their conclusions, both indicated that Plaintiff was capable of "limited social interactions" (*id.* at 80, 93). There was substantial evidence to support the ALJ's determination. He was not required to assign

---

[8] The ALJ also discounted certain opinions in Ms. Kasulinous's records that did not appear consistent with her notes (A.R. at 27). In a December 2012 Mental Capacity Exam, Ms. Kasulinous indicated that Plaintiff had severe impairments, but her notes, particularly her assessment on August 31, 2011, did not support this conclusion (*id.*). Additionally, the Mental Capacity Examination was in checkbox form. Such assessments may be discounted since they fail to provide an explanation as to how the opinion was formed. *See Greene v. Astrue*, No. CIV.A. 11-30084-KPN, 2012 WL 1248977, at *3 (D. Mass. Apr. 12, 2012); *DiBenedetto v. Barnhart,* 2004 WL 1385845, at *8 (D.Mass. June 16, 2004) (concluding that social security regulations "direct that medical opinions unsupported by relevant evidence or explanations not be given substantial weight.") (citing 20 C.F.R. § 404.1527); *Cox v. Astrue,* 2010 WL 3120593, at *7 (W.D.Wash. July 9, 2010) ("A treating physician's opinion may be discounted if it contains checkbox assessments without sufficient narrative to explain the basis for the opinion.").

controlling weight to Dr. Sampson's opinions, and his opinion appropriately reflects that he found the observations of Ms. Kasulinous more persuasive. *See Mims,* 2015 WL 3874890 at *3.

        ii. <u>The ALJ's Credibility Assessment is Supported by Sufficient Evidence</u>

  Plaintiff's contention that the ALJ erred in assessing his credibility is based on the ALJ's reliance on records from 2008 and an allegedly incomplete analysis. The ALJ properly reviewed all available evidence to analyze the intensity and persistence of Plaintiff's symptoms and determine the extent to which those symptoms limited his capacity for work. *See* 20 C.F.R. § 416.929(c)(1). The 2008 treatment at The Chicopee Medical Center was part of Plaintiff's medical history and as such was part of the evidence properly reviewed by the ALJ to assess symptoms and credibility (A.R. at 26).

  The ALJ's assessment of the intensity and persistence of symptoms required the ALJ to make a finding about the credibility of Plaintiff's statements about the symptoms and their functional effects. *See* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996)*.* The ALJ did so by considering the content of Ms. Kasulinous's notes and Dr. Sampson's evaluation, which did not support the extent of the limitations to which Plaintiff testified at the hearing. Plaintiff testified that he did not go anywhere other than the doctor's office (A.R. at 55); that he had trouble sleeping (*id.* at 61); that he had issues with anxiety a couple times a day (*id.*); and that his "good days" were days he stayed away from people (*id.* at 64). Records from Ms. Kasulinous and Dr. Sampson indicated that Plaintiff carried on a relationship with a significant other, enjoyed sitting on the porch, did yardwork, and took care of his daily needs (*id.* at 252 – 253). Ms. Kasulinous's records reflected that Plaintiff's mood, cognition, general appearance, verbal skills, and behavior were all within normal limits on almost all occasions. *See supra* note 2. Plaintiff also told Ms.

Kasulinous that he "[did] odd jobs" (*id.* at 202) and on many occasions discussed his relationship with his significant other (*id.* at 233, 246, 250, 252-54, 282, 286, 291).

The contrast between Plaintiff's testimony and the records adequately supports the ALJ's credibility analysis and his assertion that "[c]laimaint's range of daily, social, and household tasks is . . . inconsistent with claimant[']s alleged subjective limitations" (*id.* 27). *See Irlanda Ortiz,* 955 F.2d at 769 ("It is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence.") (citing *Rodriguez,* 647 F.2d at 222); *see also Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (citing *DaRosa v. Sec'y of Health and Human Servs.,* 803 F.2d 24, 26 (1st Cir.1986)).

Further, while the ALJ's decision did not discuss the type, dosage, effectiveness, and side effects of any medication taken to alleviate symptoms, this aspect of the record does not undermine the ALJ's credibility analysis. The ALJ noted and was aware that Plaintiff was prescribed several medications for his condition (*id.* at 26). Ms. Kasulinous was responsible for prescribing those medications, and her records indicate that Plaintiff was stable on the medications and made improvements over the course of treatment.

### iii.   Sufficient Evidence Supports the Step Five Decision

Relying on his complaints about the ALJ's treatment of Dr. Sampson's opinion and the credibility assessment, Plaintiff argues that the hypothetical posed to the VE was flawed, and, as a result, the ALJ's step five conclusion was not supported by substantial evidence. A hypothetical question to a VE is appropriate if it accurately reflects medical findings in the record. *Patterson v. Colvin*, No. CIV.A. 13-13198-WGY, 2015 WL 1376298, at *13 (D. Mass. Mar. 26, 2015) (citing *Arocho,* 670 F.2d at 375). *See Pollock v. Astrue*, 670 F. Supp. 2d 484, 515 (N.D.W. Va. 2009) (ALJ need only pose those hypothetical questions that are based on

substantial evidence and accurately reflect the claimant's limitations) (citing *Copeland v. Bowen,* 861 F.2d 536, 540–41 (9th Cir. 1988)). Because, for the reasons set forth above, the hypothetical question accurately reflected Plaintiff's limitations, it follows that the ALJ's step five analysis was fully supported by the record.

    II.    <u>Conclusion</u>

For the reasons stated above, Plaintiff's motion for summary judgement (Dkt. No. 15) IS DENIED, and the Commissioner's motion for an order affirming the decision (Dkt. No. 19) IS GRANTED.

It is so ordered.

                                        <u>/s/ Katherine A. Robertson</u>
                                        KATHERINE A. ROBERTSON
                                        United States Magistrate Judge